Carly Harder speaking at the top of my hand. I'll be shut off for questions for two minutes or so. Carly is here today because there's three lawyers in this case. She hopes to properly recheck the opinions of the agency, the prosecutor, and these others. And if you need to question this case, ask Dr. Harder. And I'm going to call on Dr. Carly Harder. There are two lawyers in this case. I'm going to call on one of the two. They've been consulted by these others in this case. Now, Dr. Osteo performed a psychological consultation in this case. Dr. Osteo had the opportunity to observe and interact with this woman. She had the opportunity to approach and do testing. She had the opportunity to take a thorough history of this woman. Based on all that she had experienced, Dr. Osteo found that this woman was performing simple one- or two-step tests. She would be unable to maintain consistent work pressure. And she said, basically, what we're saying is that we have a lot of limitations in her ability to interact with the general public, especially coworkers. Now, Dr. Osteo said that she had the opportunity to observe and interact with this woman. She said that she had the opportunity to observe and interact with this woman. She said that she had the opportunity to observe and interact with this woman. Now, Dr. Osteo was aware of a lot of those. In addition to responding to her personal issues, Dr. Osteo took that into consideration in getting these concrete hospitalizations. He knew one thing, which is Dr. Osteo was not aware of those things. And Dr. Osteo would make some calls to a couple of things, but he was fully aware of what they were, right? He was aware of all of them. He didn't even think of them. He didn't even think of those considerations. Right? Thank you. We have a question. What is your response to that? So, we took a position in the case prior to the initial solicitory, and I just want to call on all of our viewers. In this case, in this report, there's several people who have objected. There is an opinion, which is a reliable one, on the comments and messages that were submitted. Now, the court in that case noted that there was an improper position in this report in regards to the bond and the ruptured tissues and the neighbors' paintings, and the fact that it could be relied upon as a conservationist with the cleaners' testimony. Here, just like the position involving Dr. Osteo, who's called to rely on this as a conservationist, as a conservationist in varying instances in relation to reference to the agency. Also, the agency presumes that the city has brought conservation to the court that it did not inherit. So, I mean, again, you know, you can go back to the position and talk about saying, well, it's very likely that Osteo is the one that needs to be inherited. Okay. Anything going on with Dr. Osteo's agency? No. The problem with Osteo's agency is that the agency, such as the jury committee against Dr. Osteo, except for some individuals, because so much is outcropied about the history of bondage for rejecting majority of Dr. Osteo's agencies, was that they somehow primarily relied on the opinions of the city's respondents. And there's no concrete evidence of any of that. Dr. Osteo was a decision-making man, and he observed his body, and based on all of that, how could he possibly have changed Dr. Osteo? And it can also rely upon, and more importantly, Your Honors, every position, and especially citizens who have some kind of experience in psychology, must, to some extent, rely on what's in Dr. Osteo's mind. And that's exactly what Dr. Osteo is saying. And considering what the respondents say, he didn't find the respondents lingering. He didn't find the respondents exaggerating. He didn't actually mean that Dr. Osteo, of course, didn't mean that Dr. Osteo, so that you can all listen, Your Honors. I don't see the credit in that. Dr. Osteo's reasoning was that each of his research activities, and his opinion, were essentially put in hand-writing around pointing to evidence in psychiatry and psychopathy. Those positions are talking, relying on what he is saying, Your Honors. We hope that Your Honors are able to substitute what he is saying. We do not, Your Honor. So, I think these are the results that most imply more likely to be true than to be an entirely valid source. In this case, Dr. Osteo wasn't found suspicious. Dr. Osteo, by the Associate Administration, seemed to be far removed. That's exactly what he did. The regulations also note that more ways have been introduced into the decision-making than has relevance, and constitutes, or required. And it seems to me, Dr. Osteo also found a large limitation in his possibility to generate additional traffic. So, Dr. Osteo's path has always been this prior, sort of spontaneous experimentation, Your Honors. And the spontaneous thought process, there are a number of studies that have used location expertise to find all of Dr. Osteo's data. He's one of your sister individuals, and I'm sure a lot of that has to be confirmed. Now, I'll turn you to, so, Bailey, in this case, for a great way to tie that decision to Dr. Osteo's decision. You take the position that, in studies leading to a new clinical case, it's important for there to be psychological imperatives. In this position, the billing here serves, well, in principle, to require this to be housed more widely, and that's precisely why the regulations provide more ways that we can change the decision-making. Also, in Dr. Osteo, her cognitive effects, she really spawned the area of the farm in regards to precepts, and she's working on a model of various supervisors, and the model of a model of various supervisors is how to choose coverage, and there's various coverages of various supervisors. But just looking at that, the clinical case of Dr. Cohen, Your Honors, Dr. Cohen was teaching physics at the University of Minnesota. Dr. Cohen essentially eliminated this farm's plus-incentive framework and enabled it, and for a variety of reasons, for a variety of reasons, and that reason being that the information is available. Now, Dr. Cohen's report was through writing content that he thought was worth reading, and he was curious to hear what Dr. Cohen thought was worth reading, and Dr. Cohen is a teacher, he's a teacher, she's a teacher, and there's a lot of information that Dr. Cohen needed in a teacher's report. So that is correct, Your Honor. Dr. Cohen was taught in farm teaching, Dr. Osteo, Dr. Osteo, and so that was the case that Dr. Cohen made a conceit in his early history of teachers to think twice and substantiate in regards to a teacher's approach to their school. Obviously, we see that there are some commonalities. We don't know if the people who served on the committee in the main aspect of the hearing, Your Honor, that they were not able to talk about what Dr. Cohen's opinions were not. He didn't seem to see he didn't find that she was suffering from what he had called for, there was some check and zero. The check and zero level of evidence must be based upon safety concerns, procedures, and a teacher's speech. Are there any more questions? No. Thank you, Your Honor. I'm a member of the board of trustees of the Michigan State Department of Education. I represent the faculty of the Michigan State Department of Education, and I represent the faculty of the M.A.D.L.J. and the M.A.D.L.J. and I represent the faculty of the Michigan State Department of Education. In the admissions commission, the M.A.D.L.J. provided for faculty members to complete the admissions application along with making the appointment for the doctor's own MRI and MRI in the input to the agency's admissions, as well as the team's appointment after their enrollment in the doctor's course. In addition, the M.A.D.L.J. provided a registrar's and the psychologist's general and official opinion  on claims such as police, which the M.A.D.L.J. reportedly found not liable, and a judge's determination that the medicines are not charged. In addition, the team was consistent with the most recent medical expectations from the state doctor for the opportunity to review all of the requirements as well as the risk of injury in addition to consistently meeting the state agency's admission requirements. If we look at the M.A.D.L.J. admissions, immediately after she talked to our doctor, our state's M.A.D.L.J. also attended the admission of Dr. Walter as well as Dr. Spivak and Dr. Kaplan, who are M.H.S.B.s, arrived and additionally talked to her M.A.D.L.J. advisors on the relevant medical opportunities as well as her normal evaluation process. The M.A.D.L.J. is on the form of M.H.S.B. The M.A.D.L.J. is a full member of the M.A.D.L.J. admissions. She has a state's M.H.S.B. admission requirements and she's a full member. Some of the M.H.S.B. admissions are typically a two-year job that's just used to be a job that's in the area and can be used as part of your household expenses on some of the M.H.S.B.s. So you have to use some of these  for security, and for getting applications. Correct. So if you look at the overall M.H.S.B. you're going to get        The M.H.S.B. administrator is going to be .
judges: Reinhardt, Thomas, Christen